1

2

3

4

5

6

7

8                    IN THE UNITED STATES DISTRICT COURT

9                    FOR THE EASTERN DISTRICT OF CALIFORNIA

10   VAHAN JALADIAN,

11             Petitioner,                    No. CIV S-07-1930 JAM DAD P

12        vs.

13   D. K. SISTO, et al.,

14             Respondents.              FINDINGS AND RECOMMENDATIONS
     _____/

15

16             Petitioner is a state prisoner proceeding pro se with a petition for a writ of habeas

17   corpus pursuant to 28 U.S.C. § 2254.  Petitioner challenges his 2002 judgment of conviction

18   entered in the Sacramento County Superior Court following a jury trial on charges of felony

19   assault (California Penal Code § 254(a)(1) - count one), forcible rape (California Penal Code §

20   261(a)(2) - count two), threatening a witness (California Penal Code § 136.1(c)(1) -count three),

21   felony battery (California Penal Code § 24 (d) - count four), and making criminal threats

22   (California Penal Code § 422 - count five).  The jury also found that petitioner had inflicted great

23   bodily injury in the commission of the assault (California Penal Code § 12022.7(e)).  Petitioner

24   seeks federal habeas relief on the grounds that his trial counsel rendered ineffective assistance

25   and the evidence was insufficient to support his conviction on the rape charge.  Upon careful

26   consideration of the record and the applicable law, the undersigned will recommend that

                                                1

1   petitioner's application for habeas corpus relief be denied.

2                          PROCEDURAL BACKGROUND

3          Petitioner appealed from his conviction to the California Court of Appeal for the

4 Third Appellate District.  On February 24, 2005, the judgment of conviction was affirmed.

5 (Notice of Lodging Documents on March 18, 2010 (Doc. No. 27), Resp't's Lod. Doc. 8.)

6          Petitioner then filed a petition for review with the California Supreme Court.

7 (Resp't's Lod. Doc. 9.)  On May 11, 2005, the California Supreme Court denied the petition

8 without prejudice "to any relief to which defendant might be entitled after this court determines

9 in People v. Black, S126182, and People v. Towne, S125677, the effect of Blakely v.

10 Washington (2004) ___ U.S. __[,] 124 S. Ct. 2531, on California law."  (Resp't's Lod. Doc. 10.)

11          On November 10, 2005, petitioner filed a petition for writ of habeas corpus in the

12 Sacramento County Superior Court.  (Resp't's Lod. Doc. 11.)  On January 17, 2006, the petition

13 was denied on the merits.  (Id.)

14          On April 3, 2006, petitioner filed a habeas petition in the California Supreme

15 Court. (Resp't's Lod. Doc. 12.)  On December 13, 2006, the California Supreme Court

16 summarily denied that habeas petition.  (Resp't's Lod. Doc. 16.)

17          On September 17, 2007, petitioner filed his federal habeas petition in this court.

18 On August 13, 2008, petitioner filed an amended petition which is the operative petition in this

19 federal habeas action.

20                          FACTUAL BACKGROUND

21          In its unpublished memorandum and opinion affirming petitioner's judgment of

22 conviction on appeal, the California Court of Appeal for the Third Appellate District provided

23 the following factual summary:

24            On June 11, 2000, Deputy Matthew Petersen of the Sacramento
           County Sheriff's Department went to the home of I.B., the victim's

25            sister (the sister), in response to a report of an assault and rape that
           had occurred two nights earlier.  The sister, who had lived in the

26            United States for approximately 11 years and appeared fluent in

English, translated for the victim, who did not speak English well.
Deputy Petersen summarized the victim's statement.  Through the
sister, the victim told the officer that her boyfriend told her to come
to his house on June 9 because he was upset with her.  Her
boyfriend had loaned her some money, which she had not
completely repaid.  She had changed her telephone number and
was trying to break off the relationship.  He told her she had to
come to his house or he would go to her house and hurt her.  The
victim would not give Deputy Petersen her boyfriend's name
during this interview because she was afraid her boyfriend would
kill her.

The victim went to her boyfriend's house and, after several of his
friends left, he became upset with her.  He grabbed her head by the
hair with both hands and head-butted her three times in the nose
and forehead, causing her nose to bleed.  He then struck her in the
chest with closed fists and repeatedly kicked at her legs.  The
victim used body language demonstrating the head-butting and
blow to her chest.  Her boyfriend then told her to clean herself up
because he wanted to have sex.  She did as she was told and "let"
him have sex with her because she was afraid he would hurt her if
she did not comply.  Thereafter, he attempted to have sex with her
again but she was crying and told him "no."  Deputy Petersen did
not record what was said "word for word" but he wrote down that,
after she said "no," "he did not force [her] to do it again."  The
victim left her boyfriend's house at 4:00 a.m. and returned home.

The next day, the victim was in a lot of pain.  She called her
boyfriend and had him take her to the hospital.  The doctor said her
nose was fractured and to let it heal.  She told the doctor she
received her injuries from a fall.  Her boyfriend told her if she told
the police what he had done or he got arrested, he would kill her or
have somebody kill her.

The victim told Deputy Petersen her boyfriend had beat her
approximately five times before but she had never made a police
report.  She did not want her boyfriend arrested because she was
afraid he would hurt or kill her, but she wanted a police report so
she could get a restraining order to keep him away.  A female
officer who was also present at the interview took photographs of
the victim's body, depicting trauma to her face, and multiple
bruises on her chest, arms and legs.

The parties stipulated the victim had seen doctors Robert Hayes,
M.D., and Thomas Maclennan, M.D., at the Med-7 Urgent Care
Center on June 10, 2000.  She said she had walked into a truck and
struck her nose.  She denied having been punched with a fist.
X-rays revealed she suffered a nasal bone fracture without major
displacement.

/////

3

On July 19, 2000, the victim called 911 to report that defendant had been threatening her.  She told the dispatcher through a Russian translator that defendant was going to kill her.  She said defendant had repeatedly threatened her, threatened to kill her and told her she would not be alive in the morning.  She was afraid to leave her house and her child.

Sacramento City Police Officer Michael Avila responded to the victim's 911 call.  One of the victim's several daughters (the older daughter), who was fluent in English, translated the interview for her mother.  Through the older daughter, who was 16 years old at the time, the victim told the officer that defendant had loaned her money and physically "beat" and "raped" her on June 11 because she was unable to pay him back.  "Beat" and "raped" were the exact words the older daughter used.  The victim said she had reported the assault before but did not provide defendant's name at that time because she felt sorry for him, did not want to see him go to jail, and defendant told her he would forget about the $3,000 he loaned her if she did not report it to the police.

The victim told Officer Avila that defendant had called her earlier that day, demanded she pay him the $3,000, and threatened that no one would be able to help her and she would be dead by morning.  She was afraid of defendant because of what he had done to her in the past.  She said she did not want defendant arrested but wanted the officer to document the threatening call in case something happened to her.  She cried during part of the interview.

On August 2, 2000, Detective Slabaugh conducted a 90-minute taped interview with the victim, which was later translated by a court-registered interpreter.  During the interview, the victim said defendant beat her but that she had hesitated to report it because she felt pity for him and he had helped her a lot in the past.  Defendant was pressuring her for the $3,000 she owed him and had threatened her life and the lives of her children if she did not pay.  The victim told the detective that if defendant were arrested, things would be worse because he would be out of jail in a matter of hours and had a lot of connections, so this would be bad for her and her children.  She told the detective that defendant had some very bad friends, kept a handgun in his home and that he and his friends would torment her and her children.  When asked if she would testify against him, she said she would not because defendant had once gotten her out of jail and she did not think he was that scary.

On April 21, 2001, the victim called 911 to report that defendant had been threatening her again.  She told the dispatcher that defendant or his friend had said that everything would end in blood.  She was afraid to leave her children home by themselves and was scared.

/////

4

That same day, Sacramento Police Officer Harry Sugawara interviewed the victim at her home in response to the report of threats she had received. The victim's younger daughter (younger daughter), was present and served as an interpreter for her mother. The younger daughter spoke fluent English and had no difficulty communicating with the officer. At that time, the younger daughter would have been 16 years old. Officer Sugawara testified that, through the younger daughter, the victim told him she had received a death threat indirectly from defendant, with whom she had been intimately involved for approximately three years. Defendant had assaulted her on numerous occasions and she did not want any further contact with him. The victim described several prior acts of violence, including assaults and an attempted stabbing. The victim had received a telephone call the night before from a mutual friend named "Alex" who told her that defendant was not through with her and that "he was going to kill her and rape her daughters."

The younger daughter was emotional on the witness stand. She testified that she had heard her mother say defendant had beaten her in the past. She had translated for her mother during interviews with officers on at least five different occasions, some of which had concerned the disappearance of her sister. She did not remember the content of the conversation she translated on April 21, 2001.

District Attorney Investigator James Ross interviewed both the victim and the sister on August 23, 2001. Regarding the June 9, 2000 incident, the sister told Ross that the victim had told her defendant grabbed her by the shoulders and head-butted her "a few times," causing her nose to bleed, when she was at defendant's home on "the date in question." This occurred after defendant's friend had left. Defendant had also hit her in the chest area with his hands. The victim told the sister that she and defendant went into the bathroom and washed the blood from her face and clothes, and defendant put ice on her face. The victim felt the police report was somewhat inaccurate in that it gave the impression she had washed parts of her body other than her face. The victim also said the report was inaccurate because defendant only head-butted her one time. The sister, however, said the victim had initially told her defendant head-butted her a few times. The sister also said the victim had told her that she had sex with defendant after the assault but that "she didn't particularly want to but she did anyway." The sister felt that maybe it was an attempt on defendant's part to be romantic. The victim did not use the word "rape." According to the sister, the victim cried while she told the sister what had happened.

The victim told the sister not to give the police defendant's name because she was afraid of defendant. After the report was given, the victim told the sister not to translate any more "because of the

defendant and any kind of outcome that might arise out of, out of calling the police and prosecuting the matter." Defendant had called the sister approximately six months after the incident and told her he and the victim had only had an argument. The sister told him not to call her anymore. The sister told the investigator that she is "afraid" of defendant and did not want to come to court. She said there had been approximately four other instances in which defendant had assaulted the victim.

Through the sister, the victim told Ross that she was still in a relationship with defendant and felt that if he got probation, everything would be fine. Defendant had made a comment a few days earlier that had caused her some fear but it could have been a joke. The victim said she was afraid of defendant, both at the time of the assault and at the time of the interview, and described several other instances when defendant had assaulted her.

The victim unwillingly testified at trial, sometimes refusing to answer questions. She had repeatedly asked for the case to be dismissed. She testified that she had known defendant for four years. She was still romantically involved with defendant and had spent the night before her trial testimony with him. She said that on June 9, 2000, defendant had been jealous of her with respect to a male friend who had been visiting his house. When the friend left, he grabbed her shirt as she sat on the sofa. When she tried to get up, she grabbed his hands and his head struck her nose, causing it to bleed. She did not believe he had done that intentionally or she would not have stayed with him. Defendant apologized and she forgave him. At that point, they had consensual sex. Some of the bruises to her body were from when defendant grabbed her but others were a result of passionate sex.

The victim said she probably had another argument with defendant a few days later and that was why she called the police. She denied telling Deputy Petersen that she had been afraid to refuse sex with defendant or that defendant had threatened to kill her. She admitted she owed defendant $3,000 but denied that their argument on June 9 had been about this money. The victim also denied having told Officer Avila that defendant beat and raped her, and characterized the altercations with defendant as nothing more than "scandals" that had "been forgotten long ago."

The sister testified that she could not remember what she told Deputy Petersen or Investigator Ross but that some of Petersen's report was incorrect. She denied that the victim had told her she did not want to have sex with defendant and stated she did not understand the meaning of the word "force." She also stated she did not understand the meaning of the word "afraid." The sister appeared to have difficulty communicating in English during trial, although she admitted that she did not have such difficulties communicating earlier in the district attorney's office. She claimed

6

this was due to being less relaxed and the use of different words. She also admitted she did not want to come to court to testify.

The older daughter testified that, although she had initially translated her mother's conversation with Officer Avila on July 19, 2000, she left and the younger sister finished translating the conversation.  It was possible, however, that she was confusing the July 19, 2000 incident with the April 21, 2001 incident.  The older daughter had no memory of the content of the conversation other than the fact that her mother and defendant had been in an argument and that, initially, her mother wanted defendant arrested because she was angry.  The older daughter testified that her mother and defendant got into a lot of arguments and sometimes the police were called.  She did recall an instance when she translated a conversation with the police wherein her mother said defendant had raped her.  She believed she was 12 years old at the time.  The older daughter was 16 years old in July 2000.

Linda Barnard, Ph.D., a licensed marriage and family therapist and expert in domestic violence and BWS, testified as an expert on BWS.  She explained the cycle of domestic violence and dispelled various myths surrounding the victim's behavior.  She had never interviewed defendant or the victim in this case and testified only generally regarding domestic violence, domestic rape and BWS.

During her testimony, Barnard opined that the primary cause of domestic violence is the batterer's need for power and control over the victim.  She explained that there are several myths surrounding domestic violence, including (1) it does not happen very often; (2) women routinely lie about being victims of domestic violence; (3) women stay in violent relationships because they like it; and (4) one can tell a batterer or a battered woman by looking at them.  Barnard also explained several myths about domestic rape, including (1) it does not happen very often; (2) women routinely lie about being victims of domestic rape; (3) it most often happens in conjunction with domestic violence; and (4) it is less traumatic than stranger rape.

According to Barnard, the two primary reasons women stay in abusive relationships are fear and love, which includes the need for financial support, and concern about breaking up the family.  Furthermore, it is not uncommon for women who report domestic violence to recant, take the blame for the abuse, or cease to cooperate with the prosecution.

Barnard discussed the cyclical pattern or stages of domestic violence: (1) the tension-building stage, where there may be arguing, name calling and shoving; (2) the acute episode phase, where there is an outbreak of physical or sexual violence and the victim fears for her life or personal safety; and (3) the honeymoon period, during which the batterer apologizes and promises never to

1
2

do it again.  This tends to increase the battered woman's dependency by reinforcing her tendency to deny the seriousness of the situation.

3
4
5
6
7

Barnard testified that there is usually a delay between the instance of domestic violence and the victim's report, and that only 10 to 20 percent of the victims report the instance at all.  Victims reporting domestic rape most often do not call it "rape."  One of the most common motivations for a victim to report domestic violence is that something different happened during the incident that made her more fearful or made her perceive an increased danger.  As many as 77 percent of domestic violence and rape victims change their story, recant or become uncooperative at some point in the prosecution.

8

9    (Resp't's Lod. Doc. 8 (hereinafter Opinion) at 2-12.)

10                          ANALYSIS

11   I.   Standards of Review Applicable to Habeas Corpus Claims

12          A writ of habeas corpus is available under 28 U.S.C. § 2254 only on the basis of

13   some transgression of federal law binding on the state courts.  See Peltier v. Wright, 15 F.3d 860,

14   861 (9th Cir. 1993); Middleton v. Cupp, 768 F.2d 1083, 1085 (9th Cir. 1985) (citing Engle v.

15   Isaac, 456 U.S. 107, 119 (1982)).  A federal writ is not available for alleged error in the

16   interpretation or application of state law.  See Estelle v. McGuire, 502 U.S. 62, 67-68 (1991);

17   Park v. California, 202 F.3d 1146, 1149 (9th Cir. 2000); Middleton, 768 F.2d at 1085.  Habeas

18   corpus cannot be utilized to try state issues de novo.  Milton v. Wainwright, 407 U.S. 371, 377

19   (1972).

20          This action is governed by the Antiterrorism and Effective Death Penalty Act of

21   1996 ("AEDPA").  See Lindh v. Murphy, 521 U.S. 320, 336 (1997); Clark v. Murphy, 331 F.3d

22   1062, 1067 (9th Cir. 2003).  Section 2254(d) sets forth the following standards for granting

23   habeas corpus relief:

24
25
26

An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim -

8

1          (1) resulted in a decision that was contrary to, or involved
2   an unreasonable application of, clearly established Federal law, as
    determined by the Supreme Court of the United States; or

3          (2) resulted in a decision that was based on an unreasonable
    determination of the facts in light of the evidence presented in the
4   State court proceeding.

5   See also Penry v. Johnson, 532 U.S. 782, 792-93 (2001); Williams v. Taylor, 529 U.S. 362

6   (2000); Lockhart v. Terhune, 250 F.3d 1223, 1229 (9th Cir. 2001).  If the state court's decision

7   does not meet the criteria set forth in § 2254(d), a reviewing court must conduct a de novo review

8   of a habeas petitioner's claims.  Delgadillo v. Woodford, 527 F.3d 919, 925 (9th Cir. 2008).  See

9   also Frantz v. Hazey, 513 F.3d 1002, 1013 (9th Cir. 2008) (en banc) ("[I]t is now clear both that

10  we may not grant habeas relief simply because of § 2254(d)(1) error and that, if there is such

11  error, we must decide the habeas petition by considering de novo the constitutional issues

12  raised.").

13          The court looks to the last reasoned state court decision as the basis for the state

14  court judgment.  Robinson v. Ignacio, 360 F.3d 1044, 1055 (9th Cir. 2004).  If the last reasoned

15  state court decision adopts or substantially incorporates the reasoning from a previous state court

16  decision, this court may consider both decisions to ascertain the reasoning of the last decision.

17  Edwards v. Lamarque, 475 F.3d 1121, 1126 (9th Cir. 2007) (en banc).  Where the state court

18  reaches a decision on the merits but provides no reasoning to support its conclusion, a federal

19  habeas court independently reviews the record to determine whether habeas corpus relief is

20  available under § 2254(d).  Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003); Pirtle v.

21  Morgan, 313 F.3d 1160, 1167 (9th Cir. 2002).  When it is clear that a state court has not reached

22  the merits of a petitioner's claim, or has denied the claim on procedural grounds, the AEDPA's

23  deferential standard does not apply and a federal habeas court must review the claim de novo.

24  Nulph v. Cook, 333 F.3d 1052, 1056 (9th Cir. 2003).

25  /////

26  /////

II.  Petitioner's Claims

    A.  Ineffective Assistance of Trial Counsel

        Petitioner claims that his trial counsel rendered ineffective assistance by: (1) failing to present evidence at trial showing the victim's "manipulative and aggressive disposition;" (2) failing to raise an argument in his motion for new trial based on a post-verdict conversation between petitioner and the victim, which revealed "exculpatory information;" (3) allowing inadmissible hearsay to be admitted into evidence; (4) allowing a fabricated threat to be admitted into evidence; and (5) entering into stipulations that disadvantaged petitioner's defense.  (Pet. at 16-36.)  Petitioner also argues that the cumulative effect of the errors made by his trial counsel "rendered the result of the trial fundamentally unreliable."  (Id. at 36.)  After setting forth the applicable legal principles, the court will evaluate these claims in turn below.

    1. Legal Standards

        The Sixth Amendment guarantees the effective assistance of counsel.  The United States Supreme Court set forth the test for demonstrating ineffective assistance of counsel in Strickland v. Washington, 466 U.S. 668 (1984).  To support a claim of ineffective assistance of counsel, a petitioner must first show that, considering all the circumstances, counsel's performance fell below an objective standard of reasonableness.  466 U.S. at 687-88.  After a petitioner identifies the acts or omissions that are alleged not to have been the result of reasonable professional judgment, the court must determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance.  Id. at 690; Wiggins v. Smith, 539 U.S. 510, 521 (2003).  Second, a petitioner must establish that he was prejudiced by counsel's deficient performance.  Strickland, 466 U.S. at 693-94.  Prejudice is found where "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  Id. at 694.  A reasonable probability is "a probability sufficient to undermine confidence in the outcome."  Id.  See also Williams, 529 U.S. at 391-92; Laboa v. Calderon, 224 F.3d 972, 981

1   (9th Cir. 2000).  A reviewing court "need not determine whether counsel's performance was

2   deficient before examining the prejudice suffered by the defendant as a result of the alleged

3   deficiencies . . . .  If it is easier to dispose of an ineffectiveness claim on the ground of lack of

4   sufficient prejudice . . . that course should be followed."  Pizzuto v. Arave, 280 F.3d 949, 955

5   (9th Cir. 2002) (quoting Strickland, 466 U.S. at 697).

6           A reviewing court must "examine the reasonableness of counsel's conduct 'as of

7   the time of counsel's conduct.'"  United States v. Chambers, 918 F.2d 1455, 1461 (9th Cir. 1990)

8   (quoting Strickland, 466 U.S. at 690).  Furthermore, "'ineffective assistance claims based on a

9   duty to investigate must be considered in light of the strength of the government's case.'"  Bragg

10  v. Galaza, 242 F.3d 1082, 1088 (9th Cir. 2001) (quoting Eggleston v. United States, 798 F.2d

11  374, 376 (9th Cir. 1986)).  In assessing an ineffective assistance of counsel claim "[t]here is a

12  strong presumption that counsel's performance falls within the 'wide range of professional

13  assistance.'"  Kimmelman v. Morrison, 477 U.S. 365, 381 (1986) (quoting Strickland, 466 U.S.

14  at 689).  There is in addition a strong presumption that counsel "exercised acceptable

15  professional judgment in all significant decisions made."  Hughes v. Borg, 898 F.2d 695, 702

16  (9th Cir. 1990) (citing Strickland, 466 U.S. at 689).

17          2  Failure to Present Evidence Showing the Victim's Disposition

18          In seeking habeas relief petitioner asserts that he did not rape the victim and that

19  she "made those allegations up in order to gain leverage to control and extort petitioner."  (Pet. at

20  16.)  He claims that in order to demonstrate to the jury why the victim would falsely accuse him,

21  his defense counsel should have introduced evidence of the victim's "aggressive temperament"

22  and her "controlling and aggressive behaviors."  (Id. at 16-17.)  In support of these allegations

23  concerning the victim, petitioner has filed what purport to be excerpts of interviews conducted by

24  his trial counsel's defense investigator.  (Pet., Ex. A.)  These interview statements, which are all

25  unsigned, describe various incidents wherein the victim exhibited aggressive or violent behavior;

26  threatened petitioner or the trial witnesses; attempted to manipulate the witnesses; recanted her

11

1   allegations against petitioner; asked petitioner for money and threatened to "put [him] in prison"

2   or call the police if he did not give her money; and harassed petitioner about his relationships

3   with other women. (Id.) Some of the interviewees report that the victim was "crazy," that

4   petitioner was actually the victim of the relationship, and that the victim had committed welfare

5   fraud. (Id. at consecutive pgs. 6-8; Pet. at 19.) Petitioner argues that his trial counsel should

6   have introduced this evidence at trial "to show what kind of person [the victim] was and what she

7   was capable of" and to demonstrate her "hidden agenda" of extorting money from and

8   controlling him. (Pet. at 20.) He argues that through these documents the jury "would have

9   learned of [the victim's] deceitful and manipulative personality and made aware of her

10   propensity for violence." (Id.)

11          Petitioner also claims that he suffered prejudice as a result of his trial counsel's

12   failure to introduce at trial evidence of the victim's manipulative behavior. He argues that, while

13   his trial counsel stated during closing argument that the victim falsely accused petitioner in order

14   to extort money from him, the argument was unpersuasive because it was not supported by any

15   trial evidence. (Id. at 21.) Petitioner notes that the prosecutor "ridicule[d]" defense counsel's

16   arguments in this regard during his rebuttal argument, when he stated:

17          The best they could say was basically she extorted the defendant
            for money, she made these up and then held this case over his head.
18
            What evidence do you have of any extortion? What evidence do
19          you have from any source to show that the victim did all this to try
            to get money, to either get money or to avoid paying money if she
20          owed him?

21          [The victim] never told you she manipulated the defendant or that
            she threatened to, to, threatened him with calling the police and
22          turning him in.

23          There's been no witness, there's been no one to testify that [the
            victim] manipulated the system because of money. They can argue
24          that until they're blue in the face but they have no evidence to
            support it.

25   /////

26   /////

12

1
> Now, that is speculation and you're not allowed to speculate as
> jurors any more than the lawyers are allowed to speculate and try to
2
> get you to believe something they have no evidence to prove.

3  (Id.; Reporter's Transcript on Appeal (RT) at 743-44.)

4         Petitioner further argues that evidence of the victim's attempted manipulation and

5  extortion would have provided an explanation for the victim's attempts to change her story and

6  "clear" him after it became apparent that the matter was going to proceed to trial.  He argues,

7  "defense counsel's failure to introduce [the evidence] can only be described as deficient and

8  falling below an objective standard of reasonableness, resulting in a trial that was both unreliable

9  and fundamentally unfair."  (Pet. at 21.)

10        In his habeas petitions filed in the Sacramento County Superior Court and

11  California Supreme Court, petitioner raised numerous claims of ineffective assistance of trial

12  counsel.  (Lod. Docs. 11, 12.)  He has raised some, but not all, of those claims in the petition

13  before this court.  As explained in more detail below, petitioner has also raised several claims

14  that were not exhausted in state court.  The Superior Court specifically rejected petitioner's

15  arguments that his trial counsel rendered ineffective assistance in failing to introduce evidence of

16  the victim's manipulative behavior.  In denying habeas relief, that court reasoned as follows:

17
> Petitioner generally claims that he received ineffective assistance
> of trial counsel, in failing to reasonably investigate the facts of the
18
> case and the law on the case and to do so before selecting a defense
> strategy, failing to interview material witnesses, failing to make use
19
> of evidence and leads in the records and reports of the defense
> investigator, failing to investigate exculpatory evidence compiled
20
> by the defense investigator, failing to introduce evidence of the
> victim's past proclivity to summon police regarding petitioner's
21
> girlfriend, and failing to review police reports that showed a
> motive for the chief prosecution witness to fabricate the instant
22
> offense.  He also raises other claims.  And, he also claims
> ineffective assistance of appellate counsel, in failing to raise on
23
> appeal those issues he now raises that could have been raised on
> appeal.
24
25
> In support, petitioner attaches two police reports, recounting the
> translated statements on the incident in question.  Petitioner also
> attaches "declarations" purportedly from a Leo Gritsyuk and a Yuri
26
> Oliferchuk; however, neither declaration is signed or dated,

1    therefore the court does not consider them as evidence in support
     of the petition.
2
                                    * * *
3
4    Petitioner next claims that trial defense counsel failed to
     investigate the case and uncover evidence showing the victim as
5    manipulative, deceitful, and dangerous with a nature to use
     jealousy and sex as a tool to enrage petitioner.  He relies on the
6    unsigned affidavits purportedly from Leo Gritsyuk and Yuri
     Oliferchuk in support.

7    As noted above, those affidavits are not signed and, as such, are
     not being considered with regard to this petition.  Petitioner
8    attaches nothing further that would support his claim that such
     evidence exists, requiring denial of the claim (citations omitted).
9

10   (Petition, Ex. C at 1-3.)

11        As described above, exhibits filed by petitioner with this court reflect that his trial

12   counsel obtained statements from various witnesses regarding the victim's purported prior

13   actions and reputation.  After conducting this investigation, counsel apparently decided not to

14   pursue an attack on the victim's character at trial.  That decision may well have been due to the

15   fact that the victim appeared as a prosecution witness unwillingly and testified at trial in a

16   manner that in large part exculpated petitioner.  In any event, this tactical decision does not

17   appear to be unreasonable under the circumstances of this case and thus does not constitute

18   deficient performance.  See Strickland, 466 U.S. at 690 ("strategic choices made after thorough

19   investigation of law and facts relevant to plausible options are virtually unchallengeable").

20        Petitioner has also failed to demonstrate prejudice with respect to this aspect of

21   his ineffective assistance of counsel claim.  He has not demonstrated that any witnesses would

22   have agreed to testify consistently with the statements set forth in the exhibits submitted by

23   petitioner to this court.  See United States v. Harden, 846 F.2d 1229, 1231-32 (9th Cir. 1988) (no

24   ineffective assistance because of counsel's failure to call a witness where, among other things,

25   there was no evidence in the record that the witness would testify).  Nor has petitioner shown that

26   the unsigned statements themselves would have been admissible at trial.  Accordingly, for all of

                                        14

1 these reasons, petitioner is not entitled to relief with respect to this aspect of his ineffective

2 assistance of counsel claim.

3      3. <u>Motion for New Trial</u>

4      After the verdict was rendered, a motion for new trial was filed on petitioner's

5 behalf by retained substitute trial counsel.  (Clerk's Transcript on Appeal (CT) at 242-304.)

6 Petitioner claims that his subsequently retained counsel also rendered ineffective assistance in

7 failing to include in the motion an argument based on information obtained from a tape recording

8 of a post-verdict jail conversation between petitioner and the victim.  (Pet. at 22-23.)  Petitioner

9 argues that the recording provides evidence in support of his argument that the victim

10 manufactured the rape charges for the purpose of extorting money from him.  (<u>Id.</u>)  In this regard,

11 petitioner argues:

12      This evidence would have support [sic] a motion for a new trial.
     However, counsel inexplicably did not argue this.  Had it been
13      argued, it would have added concrete proof of what Dina was after
     all along and gutted the prosecution's chief claim – that Dina's
14      behavior was affected by Battered Woman Syndrome rather than
     money and control.

15

16 (<u>Id.</u> at 23.)

17      Petitioner raised this same claim of ineffective assistance of counsel in a

18 supplemental brief to his petition for writ of habeas corpus filed in the California Supreme Court.

19 (Resp't's Lod. Doc. 14 at 6 & Ex. 2.)  As noted above, that petition was summarily denied.

20 (Resp't's Lod. Doc. 16.)

21      This court has reviewed the typewritten transcript of the jail conversation between

22 petitioner and the victim.  (<u>See</u> Pet., Ex. B.)  Petitioner informs the court that he asked the guards

23 to tape-record the conversation.  (Pet. at 22.)  During the course of the conversation, petitioner

24 repeatedly asks the victim whether she was requesting money.  (Pet., Ex. B at 2, 4, 5, 13, 19.)  At

25 times during the conversation, the victim appears to agree that she wants money.  (<u>Id.</u> at 4, 9, 12.)

26 She explains that she needs money in order to pay for a new attorney for petitioner, or for plastic

1   surgery for herself.  (Id. at 12-13, 15, 17.)  However, at several other points in the conversation,

2   the victim states that she does not want anything from petitioner.  (Id. at 3, 8.)  Although

3   petitioner repeatedly attempts to get the victim to agree he did not rape her, she refuses to do so

4   during the conversation.  (See, e.g., id. at 4, 5-6, 7, 8, 13, 19.)  The transcript of the jail

5   conversation between petitioner and victim does not provide evidence that the victim falsely

6   accused petitioner of rape or that she was willing to recant her allegations in exchange for money.

7   Therefore, it does not provide proof of petitioner's allegations.

8          In order to demonstrate prejudice with respect to this claim, petitioner must

9   demonstrate that the motion for new trial would have been granted if his counsel had included an

10  argument based on the above-described transcript.  Specifically, petitioner must show "a

11  reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding

12  would have been different."  Strickland, 466 U.S. at 694.  Petitioner has failed to make this

13  showing with respect to this aspect of his ineffective assistance of counsel claim.  Accordingly,

14  he is not entitled to habeas relief in this respect.

15          4. Allowing Inadmissible Hearsay to be Admitted into Evidence

16          Petitioner claims that his trial counsel rendered ineffective assistance by failing to

17  object on hearsay grounds to the testimony of Officers Peterson and Avila with respect to the

18  charges of rape and making terrorist threats.  (Pet. at 24.)  Petitioner notes that the testimony of

19  these officers was based on what was told to them by the victim through her sister and daughters.

20  (Id. at 24-28.)  Petitioner argues, "all the state could marshal to prove its case was a series of

21  multi-level hearsay statements."  (Pet. at 30.)  Petitioner summarizes his claim as follows:

22          Petitioner has summarized at some length the core problem with
            these hersays [sic]: although petitioner's assault on Dina was
23          demonstrated by independent evidence, the charges of rape and the
            two threat counts were based entirely on "prior inconsistent
24          statements" attributed to Dina.  Because the [sic] unique
            evidentiary posture of this case where not only Dina but her
25          interpreters denied that the statements were ever made, a properly
            formulated hearsay objection to Officers Peterson and Avila's
26          testimonies would have, as a matter of state and constitutional law,

16

1    barred their introduction.  In addition, the multi-level translations,
     paraphrasing, and interpretations by the various parties, most of
2    whom expressed inadequacy in their command of English
     language, simply cannot have the accuracy and reliability due
3    process envisioned.  An outcome relying on this kind of
     ambiguouity [sic] cannot satisfy the level of certainty a lawful
4    conviction demands.  By failing to challenge it, counsel deprived
     petitioner of his right to counsel and a fair trial.

6    (Id. at 31.)

7         Petitioner raised this claim in his petition for a writ of habeas corpus filed in the

8    California Supreme Court.  (Resp't's Lod. Doc. 12 at 81, 95-99.)  As noted above, the Supreme

9    Court summarily denied that petition on the merits.  (Resp't's Lod. Doc. 16.)  Respondent does

10   not address this claim in the answer.

11        Petitioner's claim in this regard is vague and conclusory and relief should be

12   denied on that basis.  See Jones v. Gomez, 66 F.3d 199, 204 (9th Cir. 1995) ("'[c]onclusory

13   allegations which are not supported by a statement of specific facts do not warrant habeas

14   relief'") (quoting James v. Borg, 24 F.3d 20, 26 (9th Cir. 1994)).  Although petitioner repeats the

15   overall substance of the trial testimony of the officers and points out inconsistencies in that

16   testimony, he does not explain in the petition pending before this court, nor did he explain in his

17   state court petition, the exact testimony to which he believes his counsel should have objected

18   and/or which "properly formulated" objections should have been posed.  Under these

19   circumstances, the court is unable to address petitioner's claim.  Further, petitioner's conclusory

20   allegations are insufficient to establish either deficient performance by counsel in this regard or

21   prejudice.

22        After a review of the record, this court also concludes that petitioner's counsel did

23   not render ineffective assistance by failing to raise appropriate objections at trial.  Petitioner's

24   counsel extensively cross-examined the police officer witnesses, pointed out weaknesses in their

25   testimony, and highlighted that their information was obtained through a translation by family

26   members of the victim's exact words.  (RT at 438-45, 532-56.)  There is no evidence before this

17

court indicating that defense counsel's performance was deficient or that the result of the

proceedings would have been different had he posed hearsay objections to this testimony.  The

court notes, in this regard, that petitioner's later retained counsel argued that petitioner was

entitled to a new trial, in part, because his trial counsel had failed to object to the testimony of

officers Peterson and Avila on hearsay grounds.  (CT at 285-91.)  The state court rejected these

arguments on the basis that "even if he had objected he would have been overruled and,

therefore, it's not ineffective assistance."  (RT at 1025.  See also RT at 1017-18.)

For the foregoing reasons, this aspect of petitioner's ineffective assistance of

counsel claim should be rejected.

5. Allowing a Fabricated Threat to be Admitted into Evidence

Petitioner's next claim is that his trial counsel rendered ineffective assistance

when he failed to object to the testimony of Officer Sugawara to the effect that the victim's

daughter told him a person named Alex had called the victim and stated that petitioner was "not

through with her and he was going to kill her and rape her daughters."  (Pet. at 32; RT at 599.)

Petitioner argues:

> Because this portion is clearly hearsay, inadmissible, and very
> disturbing in nature, its admission violates due process and right to
> confrontation.  This Alex did not testify nor was there any offer of
> proof that he was unavailable.  There was no indicia of reliability
> that Alex even existed let alone uttered those words.  Had counsel
> object [sic] to its admission it would have been sustained.  Because
> of counsel's omission, the jury's fair-mindness [sic] was
> compromised by the vicious and disturbing allegation that
> petitioner had contemplated raping Dina's daughters, never mind
> that it was untrue.  Counsel's performance therefore fell below the
> standard required by the Sixth Amendment's right to counsel.

(Pet. at 33.)

In state court, petitioner claimed that the trial court erred in admitting Officer

Sugawara's testimony about Alex's telephone call, and that petitioner's appellate counsel had

rendered ineffective assistance by failing to raise that issue on appeal.  (Pet., Ex. C at 3; Resp't's

Lod. Doc. 11 at page marked "33.")  The Sacramento County Superior Court rejected petitioner's

arguments in this regard, reasoning as follows:

Petitioner next claims that the trial court violated petitioner's right to confrontation, when it admitted hearsay statements as adoptive admissions, and that appellate counsel was ineffective in failing to raise the claim on appeal. The claim concerns the admission into evidence of a phone call made by a third person named Alex to the victim, during which Alex told the victim that petitioner had told Alex that petitioner was not through with the victim and was going to kill her and rape her daughters.

Petitioner fails to attach a copy of trial transcript showing the testimony and the court's purported ruling that the testimony was admissible specifically under the adoptive admissions exception to the hearsay rule. Rather, petitioner purports to quote from trial transcript RT 589 - RT 590. The court has examined the actual trial testimony regarding this phone call, and finds the matter actually reported at RT 599 - RT 601, regarding a phone call the victim had received on April 20, 2000, from the person named Alex. The transcript indicates that a police officer gave the testimony without any objection or discussion of any kind about testifying to an adoptive admission, and indicates that petitioner's counsel cross-examined on the matter, again without any objection to the testimony. The transcript also reveals that during in limine motions at the outset of the trial, the testimony was briefly discussed and no objection was made nor mention made of it being an adoptive admission (RT - 32).

It is the petitioner's burden to show that there was any ruling on its being an adoptive admission and that that was error. It is not the court's burden to engage in a fishing expedition to discover what page of a several-hundred page trial transcript the matter was discussed as being an adoptive admission. Having failed to show the appropriate transcript to demonstrate any error on the trial court's part in admitting the testimony, the claim fails under Harris, supra.

Regardless, petitioner does not show that there was error, even with what petitioner does set forth. Petitioner was charged with and convicted of making a Penal Code § 422 threat against the victim on July 19, 2000, not on April 20, 2000. As such, the April 20, 2000 phone call from Alex was relevant only to the victim's sustained fear from the initial July 19, 2000 threat. Whether petitioner had actually instructed Alex to telephone the victim and tell her that petitioner had again threatened her was not the issue; rather, what was relevant was whether, for whatever reason, the victim remained in sustained fear from petitioner's initial July 19, 2000 threat to her. Receiving such a phone call merely added to the weight of the evidence that the victim remained in sustained fear from the actual July 19, 2000 threat to her.

/////

19

Further, the testimony was that it sounded like Alex was just repeating what petitioner had said, giving rise to a reasonable inference that petitioner was standing right next to Alex during the phone call, could hear what was being said and directed the answer that Alex gave. As such, it was part of the crime's operative facts, in petitioner's attempt to keep the victim in a sustained state of fear, rendering the statement that Alex made not hearsay at all (See People v. Patton (1976) 63 Cal. App.3d 211, 219.)

Even if petitioner were not there next to Alex while Alex made the phone call, that Alex made such a phone call and made such a threat is part of a separate crime's operative facts, that of conveying a new threat to this particular victim. Again, Alex's statement on the phone, even in this situation, is part of a crime's operative facts, and is not admitted for the truth of the matter asserted. It is not that petitioner will in fact kill the victim or rape her daughters, that the statement is admitted, it is that a threat was made; the content of the threat itself is not admitted for the truth of the matter asserted. Therefore, again the statement from Alex is not hearsay at all (see Patton, supra).

And, the testimony was admitted after the victim herself had been questioned on the witness stand about the matter. Earlier in the trial, the prosecutor asked her if she had told the officer who later testified that petitioner had threatened to kill her and rape her children, through a friend named Alex, and she claimed she could not remember (RT-212). As much of her testimony could be characterized as deliberately evasive or equivocal, and selective in her refusal to answer questions, the admission of the officer's testimony about the event was later admissible as a prior inconsistent statement (see People v. Green (1971) 3 Cal.3d 981, 988; In re Deon D. (1989) 208 Cal. App.3d 953, 962; Evid. Code §§ 770, 1235).

Petitioner nevertheless claims that the admission of the testimony described above violated his confrontation rights under Crawford v. Washington (2004) 541 U.S. 36, and that appellate counsel was ineffective in failing to raise the issue on appeal. Crawford, however, applies only to hearsay, and Alex's statements over the phone, as discussed above, was not hearsay; rather, it was the part of the crime's, or a crime's, operative facts. The victim telling the officer about Alex's statement over the phone was hearsay, but the victim testified at trial and was questioned about the matter, thus Crawford was not violated by the admission of the hearsay.

Further, petitioner claims that the admission of the statement was error only with regard to the rape and great bodily injury enhancement. However, the only charge that the statement had tendency in reason to prove was the Penal Code § 422 charge, not the rape or great bodily injury enhancement; and, as noted above, the Penal Code § 422 charge was not based on the April 20, 2000

1    phone call threat, but on a July 19, 2000 threat made directly by
     petitioner to the victim.  Again, the only relevance of the April 20,
2    2000 phone call was to the victim's sustained fear from the actual
     July 19, 2000 threat.
3
     For these reasons, the claim fails (In re Bower (1985) 38 Cal.3d
4    865).

5    (Pet., Ex. C at 3-5.)

6           Petitioner's claim, raised in the petition before this court, that his trial counsel

7    rendered ineffective assistance in failing to object to Officer Sugawara's testimony regarding

8    Alex's telephone call was not presented to the California Supreme Court and is therefore

9    unexhausted.[1]  Notwithstanding petitioner's failure to exhaust this claim, the court will

10   recommend that relief be denied with respect to this claim pursuant to 28 U.S.C. § 2254(b)(2)

11   ("[a]n application for a writ of habeas corpus may be denied on the merits, notwithstanding the

12   failure of the applicant to exhaust the remedies available in the courts of the State").[2]

13          The state court record reflects that in pretrial proceedings, including conferences

14   in chambers, the trial court made evidentiary rulings with respect to some of the anticipated trial

15   testimony, including the testimony about the call to the victim from Alex.  (Resp't's Lod. Doc.

16   12 at 054; RT at 12-35.)  From that record, it appears that petitioner's trial counsel did object to

17   some or all of that testimony and received rulings on his objections.  (RT at 31.)  In his petition

18   for a writ of habeas corpus filed with the California Supreme Court, petitioner represented that

19   his trial counsel "did object [to evidence of Alex's telephone call] under the exception to the

20   hearsay rule," but that the trial court "nonetheless admitted the above testimony violating

21

22          [1] Respondent does not address this claim of ineffective assistance of counsel in the
     answer, choosing to "ignore" the claim because it is "flatly unexhausted."  (Answer at 15.)
23

24          [2] Respondent's counsel is advised that in responding to a habeas petition filed in federal
     court, he is required to address the claims made in the federal petition, and not the claims raised
25   by the petitioner in state court.  To the extent counsel believes certain claims are not exhausted,
     the appropriate procedure is to file a motion to dismiss or to explain why the claims should be
26   rejected on the merits even though they are not exhausted.  It is not appropriate to "ignore"
     claims raised in a federal petition simply because, in counsel's view, they are unexhausted.

Petitioner's right to confrontation. . . ."  (Resp't Lod. Doc. 12 at 056.)  It is true that petitioner's trial counsel did not raise a hearsay objection when Officer Sugawara testified at trial about Alex's telephone call to the victim.  (RT at 599.)  Counsel did, however, cross-examine the officer about the call.  (Id. at 600-02.)  Thus, it appears that petitioner's trial counsel posed a hearsay objection to the admission of Officer Sugawara's testimony about Alex's telephone call to the victim, during pretrial proceedings but that his objections were overruled.  Having failed to prevail on his pretrial objection, at trial counsel fully cross-examined Officer Sugawara on the subject.  Under these circumstances, petitioner's claim that his trial counsel rendered ineffective assistance in failing to object to testimony about the telephone call from Alex to the victim lacks a factual basis and should be rejected on that basis.

In any event, petitioner has failed to demonstrate prejudice with respect to this aspect of his ineffective assistance of counsel claim.  For the reasons explained by the California Court of Appeal, an objection at trial to Officer Sugawara's testimony on hearsay grounds would not have been successful.  An attorney's failure to make a meritless objection or motion does not constitute ineffective assistance of counsel.  Jones v. Smith, 231 F.3d 1227, 1239 n.8 (9th Cir. 2000) (citing Boag v. Raines, 769 F.2d 1341, 1344 (9th Cir. 1985)).  See also Rhoades v. Henry, 596 F.3d 1170, 1179 (9th Cir. 2010) (counsel did not render ineffective assistance in failing to investigate or raise an argument on appeal where "neither would have gone anywhere"); Matylinsky v. Budge, 577 F.3d 1083, 1094 (9th Cir. 2009), cert. denied, ___U.S.___, 130 S. Ct. 1154 (2010) (counsel's failure to object to testimony on hearsay grounds not ineffective where objection would have been properly overruled); Rupe v. Wood, 93 F.3d 1434, 1445 (9th Cir. 1996) ("the failure to take a futile action can never be deficient performance").

For the foregoing reasons, petitioner is not entitled to habeas relief on this aspect of his claim of ineffective assistance of counsel.

/////

/////

1          6. <u>Entering into Stipulations that Disadvantaged the Defense</u>

2               Petitioner next claims his trial counsel rendered ineffective assistance by entering

3   into two "unnecessary" stipulations that "severely disadvantaged" petitioner's defense. (Pet. at

4   34.) In the first such stipulation, the parties agreed that on June 10, 2000, the victim was

5   examined by Doctors Hayes and Maclennan and that, if called to testify, Dr. Maclennan would

6   opine that "the x-rays showed that [the victim] suffered a nasal bone fracture without major

7   displacement." (RT at 650.) Petitioner argues that this stipulation relieved the prosecution of its

8   burden to demonstrate that petitioner's actions caused great bodily injury. (Pet. at 34-35.) He

9   also contends that the stipulation "deprived petitioner of the opportunity" to demonstrate that the

10  victim's nose fracture did not constitute "great bodily injury." (<u>Id.</u> at 35.) Petitioner argues, "it is

11  clear that testimony from a medical expert would have provided the necessary evidence . . . to

12  show that [the victim's] injuries were moderate in nature rather than [great bodily injury]." (<u>Id.</u>)

13  He further argues that, without such evidence, his trial counsel's statements during closing

14  argument that the victim's injuries were only minor "sounded pathetically weak." (<u>Id.</u>)

15              The Sacramento County Superior Court rejected petitioner's habeas challenge to

16  this stipulation, reasoning as follows:

17              As to his specific claims of ineffective assistance of counsel,
             petitioner first claims that trial defense counsel was ineffective in
18           entering into a stipulation at trial that on June 10, 2000, the victim
             was examined by certain doctors at a certain urgent care center, and
19           that x-rays taken there showed that the victim had suffered a nasal
             bone fracture without major displacement. Petitioner claims that
20           trial counsel should have produced evidence to show that this
             injury was moderate or minor in nature. Petitioner concedes that
21           case law, including <u>People v. Johnson</u> (1980) 104 Cal. App.3d 598,
             has long established that a bone fracture may constitute a
22           substantial and significant injury within the meaning of Penal Code
             § 12022.7, but argues that it is not such an injury as a matter of
23           law. Petitioner argues that in this case, the victim's injuries were
             minor, because the victim did not complain of further pain or
24           suffering other than at the time the injury was inflicted, and that if
             the jury had been shown evidence of the latter the jury would not
25           have found true the great bodily injury enhancement. Petitioner
             argues that the stipulation removed the element from the jury.

26  /////

23

Petitioner is mistaken.  The stipulation did not remove any element from the jury.  All the stipulate [sic] did was dispense of the need to have testimony and/or exhibits admitted to show that the victim had suffered a nasal bone fracture without major displacement.  It was not a stipulation *that the injury suffered as a matter of law constituted great bodily injury.*  And, whether the evidence of the nasal fracture had come in under the stipulation or through testimony and/or exhibits, it did not preclude defense counsel from introducing evidence to show that the injury was actually only minor in nature.

It is unclear whether petitioner is additionally arguing that trial defense counsel was ineffective in failing to introduce evidence to show that the injury was actually only minor in nature.  Even if petitioner is setting forth such an argument, however, petitioner fails to attach any reasonably available documentary evidence to show what specific competent evidence trial defense counsel should have introduced at trial that would have been reasonably likely to have made a difference in the outcome of the case (see In re Swain (1949) 34 Cal.2d 300; In re Harris (1993) 5 Cal.4th 813, 827 fn. 5; Strickland v. Washington (1984) 466 U.S. 668).  Nor would it be likely that any such evidence exists, as the police report of June 11, 2000 that petitioner attaches indicates that the victim's sister translated for the victim to police that two days previously, petitioner had hit, kicked, and headbutted her, causing her to bleed from her nose, and that she continued to hurt through the next day, when she called petitioner and had him take her to a doctor, who said she had a fractured nose; further, the officer personally observed bruises two inches in length and purple in color on both sides of the victim's nose below her eyes, as well as a vertical bruise on the bridge of her nose one inch in length, as well as other bruises over other parts of her body that were purple in color.  As the police report shows multiple injuries, any of which could have constituted the great bodily injury to the victim (see Johnson, supra [nose fracture]; People v. Jaramillo (1979) 98 Cal. App.3d 830 [multiple contusions and discoloration]; People v. Thomas (1979) 96 Cal. App.3d 507, disapproved on other grounds in People v. Kimble (1988) 44 Cal.3d 480 [facial injuries]), petitioner's claim simply fails.

(Pet., Ex. C at 1-2.)

The decision of the Superior Court rejecting petitioner's claim is not contrary to or an unreasonable application of Strickland and should not be set aside.  As explained by the state court, the challenged stipulation did not establish as a matter of law that the victim's nose fracture constituted "great bodily injury," nor did it prevent petitioner's counsel from introducing evidence contesting the great bodily injury allegation.  In addition, petitioner's argument that his

trial counsel rendered ineffective assistance in failing to introduce expert medical testimony that

the victim's injuries did not constitute "great bodily injury" fails for lack of a showing of

prejudice.  Petitioner has not demonstrated that any expert would have so testified.  See Bragg,

242 F.3d at 1088 (no ineffective assistance where petitioner did "nothing more than speculate

that, if interviewed," a witness might have given helpful information); Dows v. Wood, 211 F.3d

480, 486 (9th Cir. 2000) (no ineffective assistance of counsel where there was no evidence in the

record that a helpful witness actually existed and petitioner failed to present an affidavit

establishing that the alleged witness would have provided helpful testimony for the defense);

United States v. Berry, 814 F.2d 1406, 1409 (9th Cir. 1987) (appellant failed to meet prejudice

prong of ineffective assistance claim because he offered no indication of what potential witnesses

would have testified to or how their testimony might have changed the outcome of the hearing).

The Strickland standard "places the burden on the defendant, not the State, to show a 'reasonable

probability' that the result would have been different."  Wong v. Belmontes, ___ U.S. ___, 130

S. Ct. 383, 390-391 (2009) (quoting Strickland, 466 U.S. at 694).  Petitioner has failed to meet

that burden with respect to this aspect of his claim of ineffective assistance of counsel.

       The second stipulation challenged by petitioner involves an interview of the

victim by petitioner's trial counsel, wherein counsel asked the victim if she believed the injury to

her nose was caused by petitioner intentionally or accidentally.  The prosecutor summarized this

stipulation for the record, as follows:

> The following is a translated transcription of a portion of an interview conducted on November 29, 2001 between [petitioner's trial counsel] and [the victim].

> [Petitioner's trial counsel]:  Now, the, what appears to be the heart of this matter whether or not when he injured your nose he did it intentionally or accidentally.

> And then the investigator who was also serving as Russian translator said, Did it intentionally or accidently [sic], think about it.

/////

25

[The victim]:  No, not intentionally.  I am saying we were friends and it never happened before.

[Petitioner's trial counsel]:  Now, what I mean accidental or intentional, I mean, when his head came to contact with your nose, he wanted that to happen?  So what was going in his mind is going to be an important issue in this case.  Now, if you guys, you're fighting, he grabs you and the two of you come together, that's an accident.  That is clear.

[The victim]:  If this is an accident, here, here, and here, the blue marks, what is this?

To which the investigator says, How about the bruise on the chest and abdomen.

[Petitioner's counsel] says, You asking me about what happened?  I cannot tell you what happened.

[The victim]:  If it was simply accidentally then he would hit me and say, ouch, it happened.  And would not hit me here.  I understand it this way, right?

[Petitioner's trial counsel]:  It is my interpretation from listening to you today, I think, you believe he did it intentionally.  And I will be very honest with you that on the witness stand I'm going to spend a lot of time in this area because that's a big issue in this case.  And it is not my desire to make life unpleasant for you, it is my job to protect my client's rights.

(RT at 651-52.)  Petitioner argues that the last paragraph of this stipulation placed trial counsel's "devastating opinion" before the jury, thereby causing prejudice to his defense.  (Pet. at 36.)

Petitioner's claim challenging his attorney's performance with respect to this second trial stipulation has, once again, not been addressed by respondent in the answer filed in this court.  This aspect of petitioner's ineffective assistance of counsel claims appears to be unexhausted, having not been presented by petitioner to the California Supreme Court.  However, this court will recommend that relief with respect to this claim be denied pursuant to 28 U.S.C. § 2254(b)(2).

Contrary to what petitioner appears to be arguing, the challenged second trial stipulation does not establish that trial counsel believed petitioner deliberately injured the victim's nose.  Rather, the gist of the stipulation appears to be that, during a pretrial interview the

victim apparently expressed a belief that petitioner's actions were intentional and that defense

counsel expressed an intention to challenge on cross-examination the victim's belief in that

regard at trial.  Counsel's intention to challenge the victim's interpretation of the events in

question reflects sound trial strategy and is therefore "virtually unchallengeble." Strickland, 466

U.S. at 690.  Further, petitioner has not established prejudice with respect to this aspect of his

claim.  This second trial stipulation is somewhat confusing and, in any event, does not appear to

be contrary to significant evidence introduced at trial that petitioner intentionally hit the victim in

the nose, causing a fracture.  Under these circumstances, petitioner has failed to demonstrate that,

but for trial counsel's errors, the result of the proceedings would have been different. Id. at 694.

Accordingly, petitioner is not entitled to relief on this claim.

### 7. Cumulative Effect of Trial Counsel's Errors

Petitioner claims that the cumulative effect of the errors made by his trial counsel

"were of such magnitude that resulted in a complete breakdown in the adversarial process." (Pet.

at 36.)  This claim appears to be unexhausted in that it has not been presented by petitioner to the

California Supreme Court.  Apparently in reliance thereon, respondent has elected not to address

the claim in the answer filed in these proceedings.  Nonetheless, this court will recommend that

relief be denied with respect to this claim pursuant to 28 U.S.C. § 2254(b)(2).

The Ninth Circuit Court of Appeals has concluded that under clearly established

federal law the combined effect of multiple trial errors may give rise to a due process violation if

it renders a trial fundamentally unfair, even where each error considered individually would not

require reversal.  Parle v. Runnels, 505 F.3d 922, 927 (9th. Cir. 2007) (citing Donnelly v.

DeChristoforo, 416 U.S. 637, 643 (1974) and Chambers v. Mississippi, 410 U.S. 284, 290

(1973)).  "The fundamental question in determining whether the combined effect of trial errors

violated a defendant's due process rights is whether the errors rendered the criminal defense 'far

less persuasive,' Chambers, 410 U.S. at 294, and thereby had a 'substantial and injurious effect

or influence' on the jury's verdict." Parle, 505 F.3d at 927 (quoting Brecht v. Abrahamson, 507

1   U.S. 619, 637 (1993)).  See also Hein v. Sullivan, ___ F.3d ___, 2010 WL 1427588, *15 (9th

2   Cir. Apr. 12, 2010) (same).

3          This court has addressed each aspect of petitioner's claim of ineffective assistance

4   of counsel and has concluded that no error of constitutional magnitude occurred.  This court also

5   concludes that the alleged errors, even when considered together, did not render petitioner's

6   defense "far less persuasive," nor did they have a "substantial and injurious effect or influence on

7   the jury's verdict."  Parle, 505 F.3d at 927.  Accordingly, petitioner is not entitled to relief on his

8   cumulative error claim.

9          B.  Sufficiency of the Evidence

10         Petitioner claims that the evidence introduced at his trial was insufficient to

11  support his conviction on the rape charge.  He argues that the testimony introduced in support of

12  the rape was based on statements made to the police by the victim's sister and daughter, who

13  asserted at trial that they were not competent to translate Russian into English.  (Pet. at 37.)  He

14  contends that "reliance on their self professed inaccurate translation as the sole evidence to

15  convict petitioner violates due process because this evidence cannot be said as being reasonable,

16  credible and of solid value."  (Id.)  Petitioner also notes that the victim partially recanted her

17  accusations and that the victim's sister and daughter backed away from their initial statements to

18  police.  In light of this, he contends that "the only reasonable conclusion must be that there was

19  no rape."  (Id.)  Petitioner further argues that the evidence in support of the rape charge was

20  "flimsy," and therefore insufficient to support the jury's verdict.  (Id.)

21         The California Court of Appeal rejected petitioner's argument regarding the

22  alleged insufficiency of the evidence on the rape charge, reasoning as follows:

23             Defendant next makes a somewhat convoluted argument that the
               evidence was insufficient to support his conviction for rape.  He
24             argues that "[t]he only evidence specifically supporting the rape
               charge came entirely in the form of reports from the police of prior
25             inconsistent statements" of the translators and that "[i]n each case,
               a relative of the complaining witness translated to the
26             non-Russian-speaking officers what [the victim] supposedly had

28

said." Thus, he reasons, that the "trans-linguistic, multiple hearsay ... must be scrutinized particularly thoroughly because of its inherent probability to lose (or gain) something in the translation" and therefore, the reliability of this hearsay evidence should weigh in this court's assessment of the sufficiency of the evidence. Moreover, he argues, the translations may have been inaccurate.

The flaw in this approach is that defendant did not object to the testimony as hearsay at trial and therefore he cannot challenge the admissibility of that testimony on appeal.[3] ( Evid. Code, § 353, subd. (a); <u>People v. Bolin</u> (1998) 18 Cal.4th 297, 321.) Having waived the argument that the translators' testimony, in whole or in part, should not have been admitted, defendant cannot challenge the admissibility of that testimony under the guise of challenging the sufficiency of the evidence. Because the admissibility of the translators' testimony is, at this point, beyond question, in reviewing the sufficiency of the evidence we have to take that testimony into account in our analysis. Doing so, we conclude substantial evidence supports defendant's conviction for rape.

"In reviewing [a claim regarding] the sufficiency of the evidence, we must determine 'whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' [Citation.] '[T]he court must review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence – that is, evidence which is reasonable, credible, and of solid value – such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' [Citation.] We '"presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence."'" (<u>People v. Davis</u> (1995) 10 Cal.4th 463, 509, italics omitted.) "Before the judgment of the trial court can be set aside for the insufficiency of the evidence, it must clearly appear that on no hypothesis whatever is there sufficient substantial evidence to support the verdict of the jury." (<u>People v. Hicks</u> (1982) 128 Cal. App.3d 423, 429.) This is not such a case.

Here, the victim's sister had testified inconsistently and remembered little at trial. Deputy Petersen testified that when he spoke with the sister and the victim, the sister translated the victim as saying that on June 9, defendant head-butted her three times, punched and kicked her for awhile, then told her to clean up because he wanted to have sex. She "let" him because she was "afraid" he would hurt her if she refused him. Afterward, he

---

[3] The contention was raised, however, in defendant's second motion for a new trial filed by his retained substitute trial counsel. That motion was denied.

attempted again but she was crying and told him "no" and he "did not force [her] to do it again."

The sister also told the district attorney's investigator that the victim "didn't particularly want to [have sex with defendant] but she did anyway," and the sister felt that maybe it was an attempt on the defendant's part to be romantic.  Otherwise, the sister essentially repeated the same story to Investigator Ross that she had given Deputy Petersen.

The older daughter was also inconsistent with her previous statement to police and unable to remember many of the relevant facts at trial.  Thus, Officer Avila testified that the older daughter reported on July 19 that the victim said defendant had beaten and raped her on June 11.  "Beat" and "raped" were the exact words the older daughter used.

This testimony, if true, is sufficient to support defendant's conviction for rape.  Although defendant insists that the testimony is unreliable and, therefore, insufficient, "[c]onflicts and even testimony which is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends ."  (People v. Thornton (1974) 11 Cal.3d 738, 754, overruled on other grounds in People v. Flannel (1979) 25 Cal.3d 668, 684, fn. 12.)  We do not consider the credibility of witnesses in determining whether there is substantial evidence.  (People v. Elize (1999) 71 Cal. App.4th 605, 615.)

Finally, defendant attacks the evidence by arguing that the sister's "abilities [as a translator] were of questionable merit," as she claimed to have difficulty with the words "force" and "afraid" at trial.  This, of course, was solely the province of the jury and we will not substitute our evaluation of the sister's abilities for that of the fact finder.  (People v. Ochoa (1993) 6 Cal.4th 1199, 1206.)

(Opinion at 17-20.)

The Due Process Clause of the Fourteenth Amendment "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged."  In re Winship, 397 U.S. 358, 364 (1970).  There is sufficient evidence to support a conviction if, "after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  Jackson v. Virginia, 443 U.S. 307, 319 (1979).  "[T]he

dispositive question under <u>Jackson</u> is 'whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt.'" <u>Chein v. Shumsky</u>, 373 F.3d 978, 982 (9th Cir. 2004) (quoting <u>Jackson</u>, 443 U.S. at 318). "A petitioner for a federal writ of habeas corpus faces a heavy burden when challenging the sufficiency of the evidence used to obtain a state conviction on federal due process grounds." <u>Juan H. v. Allen</u>, 408 F.3d 1262, 1274 (9th Cir. 2005). In order to grant the writ, the federal habeas court must find that the decision of the state court reflected an objectively unreasonable application of <u>Jackson</u> and <u>Winship</u> to the facts of the case. <u>Id.</u> at 1275 & n.13.

The court must review the entire record when the sufficiency of the evidence is challenged in habeas proceedings. <u>Adamson v. Ricketts</u>, 758 F.2d 441, 448 n.11 (9th Cir. 1985), <u>vacated on other grounds</u>, 789 F.2d 722 (9th Cir. 1986) (en banc), <u>rev'd</u>, 483 U.S. 1 (1987). It is the province of the jury to "resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." <u>Jackson</u>, 443 U.S. at 319. If the trier of fact could draw conflicting inferences from the evidence, the court in its review will assign the inference that favors conviction. <u>McMillan v. Gomez</u>, 19 F.3d 465, 469 (9th Cir. 1994). The relevant inquiry is not whether the evidence excludes every hypothesis except guilt, but whether the jury could reasonably arrive at its verdict. <u>United States v. Mares</u>, 940 F.2d 455, 458 (9th Cir. 1991). Thus, "[t]he question is not whether we are personally convinced beyond a reasonable doubt" but rather "whether rational jurors could reach the conclusion that these jurors reached." <u>Roehler v. Borg</u>, 945 F.2d 303, 306 (9th Cir. 1991). The federal habeas court determines sufficiency of the evidence in reference to the substantive elements of the criminal offense as defined by state law. <u>Jackson</u>, 443 U.S. at 324 n.16; <u>Chein</u>, 373 F.3d at 983.

Petitioner was charged with forcible rape, in violation of California Penal Code § 261(a)(2). That code section provides as follows:

(a) Rape is an act of sexual intercourse accomplished with a person not the spouse of the perpetrator, under any of the following circumstances:

1                                   * * *

2          (2) Where it is accomplished against a person's will by means of
           force, violence, duress, menace, or fear of immediate and unlawful
3          bodily injury on the person or another.

4          Viewing the evidence in the light most favorable to the verdict, the undersigned

5  concludes that there was sufficient evidence introduced at petitioner's trial from which a rational

6  trier of fact could have found beyond a reasonable doubt that petitioner committed the forcible

7  rape of the victim.  The evidence, as summarized by the appellate court and set forth above,

8  supports the jury's finding that petitioner committed an act of intercourse with the victim against

9  her will by force or fear.  This is true even though some aspects of the trial testimony of the

10  victim's sister and daughter were inconsistent with their prior statements to police.  As explained

11  above, it is the province of the jury, and not the courts, to weigh the credibility of trial witnesses.

12  The state courts' denial of habeas relief with respect to petitioner's insufficient evidence claim is

13  not an objectively unreasonable application of <u>Jackson</u> and <u>Winship</u> to the facts of the case.

14  Accordingly, petitioner is not entitled to federal habeas relief with respect to this claim.[4]

15                               CONCLUSION

16         For the foregoing reasons, IT IS HEREBY RECOMMENDED that petitioner's

17  application for a writ of habeas corpus be denied.

18         These findings and recommendations are submitted to the United States District

19  Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty-

20  one days after being served with these findings and recommendations, any party may file written

21  objections with the court and serve a copy on all parties.  Such a document should be captioned

22  "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections

23  _____

24         [4] Any argument that the admission into evidence of the unreliable testimony of the
victim's sister and daughter violated state law is not cognizable in this federal habeas corpus
25  proceeding.  <u>See Waddington v. Sarausad</u>, ___ U.S. ___, 129 S. Ct. 823, 832 n.5 (2009) ("we
have repeatedly held that 'it is not the province of a federal habeas court to reexamine state-court
26  determinations on state-law questions"); <u>Bradshaw v. Richey</u>, 546 U.S. 74, 76 (2005) ("[A] state
court's interpretation of state law . . . binds a federal court sitting in federal habeas").

1   shall be served and filed within fourteen days after service of the objections.  Failure to file

2   objections within the specified time may waive the right to appeal the District Court's order.

3   Turner v. Duncan, 158 F.3d 449, 455 (9th Cir. 1998); Martinez v. Ylst, 951 F.2d 1153 (9th Cir.

4   1991).[5]

5   DATED: April 19, 2010.

6

7   _Dale A. Drozd_____

8   DALE A. DROZD
    UNITED STATES MAGISTRATE JUDGE

9   DAD:8:
    jaladian1930.hc

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24   [5]  In any objections he elects to file to these findings and recommendations petitioner may
     address whether a certificate of appealability should issue in the event he wishes to pursue an
25   appeal of the judgment in this case.  See Rule 11, Federal Rules Governing Section 2254 Cases
     (the district court must issue or deny a certificate of appealability when it enters a final order
26   adverse to the applicant).

33